# Hall et al. *v.* Delaware, Lackawanna & Western Railroad Company, Appellant.

*Eminent domain—Evidence—Incompetent evidence—Incompetent witnesses—Relevant evidence—Erroneous exclusion.*

1. In eminent domain proceedings to assess damages to a tract of land caused by the condemnation of a part thereof for railroad purposes, a witness is incompetent to testify as to the value of the land before and after the taking, where he admits that in forming his opinion, he considered that the land could have been divided into separate lots desirable for sites for summer residences and the worth of the separate lots, but where he did not state that there was any market or present demand for sites for summer residences, or any circumstances from which a present market or demand could be reasonably inferred.

2. While the general advantage, resulting as well to the public as to the property which is the subject of the condemnation, is not to be considered in estimating the benefits, if any, to that property, yet any special advantage arising thereout affecting an enhancement in value of the land out of which the appropriation has been made, and in which the other lands in the neighborhood does not share, may be considered; it is error, therefore, to exclude evidence to the effect that by reason of the construction of a railroad station near plaintiff's property as a part of the general plan of railroad improvement in the neighborhood, the damages which plaintiff would otherwise have sustained by reason of the condemnation were reduced.

Argued Feb. 25, 1918. Appeal, No. 131, Jan. T., 1918, by defendant, from judgment of C. P. Lackawanna Co., Jan. T., 1913, No. 250, on verdict for plaintiffs, in case of Lephe Hall and Jessie Hall v. The Delaware, Lackawanna & Western Railroad Company. Before BROWN, C. J., POTTER, STEWART, MOSCHZISKER and WALLING, JJ. Reversed.

Appeal from award of Board of Viewers in condemnation proceedings. Before EVANS, P. J.

The opinion of the Supreme Court states the facts.

Verdict for plaintiff for $12,000 and judgment thereon. Defendant appealed.

*Errors assigned* were rulings on evidence.

*H. A. Knapp,* of *Knapp, O'Malley, Hill & Harris,* for appellant, cited: Savings & Trust Co. of Indiana v. Penna. R. R. Co., 229 Pa. 484; Kleppner v. Pittsburgh, Etc., R. R., 247 Pa. 605; Penna., Etc., R. R. Co. v. Cleary, 125 Pa. 442; Hamory v. Penna., Etc., R. R. Co., 222 Pa. 631; Michael v. Crescent Pipe Line Co., 159 Pa. 99; Friday v. Penna. R. R. Co., 204 Pa. 405; Machesney v. Pittsburgh, Etc., R. R. Co., 252 Pa. 225; Brennan v. Pittsburgh, Etc., R. R. Co., 230 Pa. 228; Rea v. Pittsburgh, Etc., R. R. Co., 229 Pa. 106; Penna. S. Val. R. R. Co. v. Cleary, 125 Pa. 442; Kleppner v. Pittsburgh, Etc., R. R. Co., 247 Pa. 605; Church v. Delaware, L. & W. R. R. Co., 250 Pa. 21.

*John P. Kelly* and *S. B. Price,* with them *John H. Price* and *Cole B. Price,* for appellees, cited: Shenango & A. R. R. Co. v. Braham, 79 Pa. 447, 452, 453; Wilson v. Equitable Gas Co., 152 Pa. 566, 569; Cox v. Philadelphia H. & P. R. R. Co., 215 Pa. 506.

OPINION BY MR. JUSTICE STEWART, October 7, 1918:

This was a proceeding for the assessment of damages for the appropriation of something less than two acres of land, out of a tract containing twenty acres belonging to the plaintiffs, by the defendant company under its right of eminent domain. The land is situate somewhere in Lackawanna County. It may be a matter of safe inference that it is not far from the City of Scranton, but its exact locality is nowhere described as it should have been. The appellees in their argument aver that it is in

the Borough of Glenburn. At the time of the appropriation it was farm land, and had always been so utilized, notwithstanding several years before it had been plotted into building lots. The jury returned a verdict in favor of the plaintiffs in the sum of $14,118. The appeal is from the judgment entered on the verdict. The assignments of error are numerous, but, with few exceptions, not necessary here to consider, since they all relate to the admission or rejection of evidence on the trial. The second and fourth assignments are fairly illustrative of appellant's contention and for present purposes we may confine the discussion to these, taking them in their inverse order.

Both assignments show that the case was tried on a mistaken theory of the law governing in such cases. Unquestionably in a proceeding such as this it is entirely proper to take into consideration an element of damage anything peculiar to the owner's property that distinguishes it from the other lands in the same neighborhood giving it increased value in the public market before its appropriation. Otherwise the landowner would not be receiving the full compensation for his deprivation which the law intends. If he could convert his land in the general market at the time of its appropriation by the railroad and receive an enhanced price over and above what his neighbors could receive for theirs lacking the peculiar advantages possessed by his, there is no reason why he should not be correspondingly compensated by the railroad company. And this is equally true where the peculiarity which gives enhanced value to his extends to lands lying in a particular locality, whether owned by one or several. But it is always to be borne in mind that the law does not presume the existence of such peculiarity and the loss on account of its appropriation by the railroad; it always rests upon a party claiming the extraordinary damage first of all to show it, and to show that it was available to him for the purpose of conversion in the public market at the time he was deprived of his

land by the railroad company. The mere assertion of any such fact without proof comes to nothing. The condemnation of this property occurred 3d, December, 1912. Admittedly it was then farm land. Whether then so used or not, certainly it had not been used for other purposes. The plaintiffs' contention was that it had a value beyond that of farm land in that it was "most desirable for sites for summer residences either in small lots or in larger pieces"; that the result of the railroad's appropriation was "to create an embankment along the highway upon which the land fronted which rendered it inaccessible and entirely destroyed it for building purposes, so that the only use the remainder of the plot could be put to was that of farming." The grievance is thus stated by counsel for appellants in their argument, and it is the whole of it, briefly expressed. It is qualified somewhat by the witness whose testimony is the subject of the fourth assignment, which we are now discussing, when in answer to the question put to him on cross-examination, "Under all the conditions prior to the taking of the property what was this land adapted for?" he replied, "For elaborate and palatial home sites." The witness gave it as his opinion that the value of the plaintiffs' land before taken by the railroad was $22,000 for the entire tract, whereas, after the tract of less than two acres had been appropriated, the value of the whole tract remaining was but $1,700, the reduction being due to the fact that the tract was no longer available for "elaborate and palatial home sites," it nowhere appearing from his testimony, nor indeed that of any other witness, that there was any market or present demand for such sites, nor were any circumstances shown from which present market or demand could be reasonably inferred. He was asked this question, "The growth of the community up there has been what, large or small?" The answer to this question would have afforded some ground of inference as to the extent of the market, if there was any. His answer was, "It has been small, but it has been made up of excellent

industrial people, who have taken the property in the vicinity for home sites." We see nothing improbable in this if the sites actually purchased had been for "elaborate and palatial home sites." Although the witness had testified that he believed the tract in December, 1912, before taken, was of the value of $1,100 per acre, and would have brought that in the market, it is very evident that his estimate was based on the selling price of small individual lots as plotted for building purposes. This is made plain by his answer to the next question that followed, "What is the highest price paid for any plot of lots in the vicinity, to your knowledge, in tracts of five acres or over, that was paid in any sale to your knowledge, which sale you used as a basis in determining the value of the Mary Hall property?" To this he replied, "There were none for many years." This question followed, "I am asking you to name me the highest price per acre that any plot within your knowledge brought, which plot was over five acres in area and sold in the vicinity of the Mary Hall property?" The answer was, "I couldn't be exact about that. I know that there was one piece sold for about $450, perhaps nearly $500 per acre, for what was available of the whole tract. That was seven or eight years before the taking." Again he was asked, "Of the sales within your knowledge and on which you base your judgment as to the value of the Mary Hall property, tell me the highest price brought in the sale of such parcel of land containing five acres or over within the last ten years?" His answer was, "I am pretty sure it was $450 per acre." Again, "Basing your opinion upon a sale of property the highest of which was $450 per acre, you say this land was worth three times as much?" He answered, "Yes, because of its location and facilities for travel, etc." It is not unimportant to note that it nowhere appears in the testimony of this witness, and it is no less true of most of other witnesses for the plaintiffs, that when the comparison is made between the estimates made of plaintiffs' land and the prices paid for

other land in the neighborhood, no distinction is observed between lands sold at private sale and those sold at public, if any there were. We only observe that private sales, as a general rule, are not the best test of market value. Indeed, they can be of little aid except as the terms, conditions and circumstances under which the sales were made were publicly made known, and it be thus made to appear that it was market value that was in the mind of the parties, and that alone. Evidently, what was in the witness's mind was not the market value of plaintiffs' land when appropriated, or what it would have sold for as one undivided tract at public sale, but what plaintiffs could have realized for it with time and opportunity given to sell it out in lots or parcels, upon such terms as might be agreed upon as to the time of payment, etc. Even then he is silent as to the extent of the demand for such lots; in other words, as to the ability of the market to take them. The only inference from his testimony must be that the market and demand were limited and precarious. We can do no better here than quote the language of Mr. Justice WILLIAMS in Penna., Etc., R. R. Co. v. Cleary, 125 Pa. 442, where he says, "The true measure of the damages sustained by any given lot of land is found in the difference between the selling value before and after the entry complained of: Reading, Etc., R. R. Co. v. Balthaser, 119 Pa. 472. It is proper to consider for what purpose it may be used to advantage in order to determine for what price it will sell. It may be saleable as a site for the erection of a hotel, a factory, a dwelling or a wharf, but it is not proper to lay before the jury proof of what the hotel or other structure would cost, together with proof of the value of the lot with such structure upon it, and treat the difference between these sums as the value of the lot. Such a method would be speculative and fanciful. Equally improper is the evidence showing how many building lots the tract under consideration could be divided into, and what such lots would be worth separately. It is proper to inquire what

the tract is worth, having in view the purpose for which it is best adapted, but it is the tract, and not the lots into which it might be divided, that is to be valued......The jury are to value the tract of land and that only. They are not to determine how it could best be divided into building lots, nor conjecture how fast they could be sold, nor at what price per lot. A speculator or investor, in deciding what price he could afford to pay, would consider the chances and probabilities of the situation as then existing. A jury should do the same thing. They are not to inquire what a speculator might be able to realize out of a resale in the future, but what a present purchaser would be willing to pay for it in the condition it is now in. This is a rule that is well settled and the court should have drawn the attention of the jury to it so as to have left no room for uncertainty on their part. They should have been told that they had nothing to do with the subdivision of this tract, the price of the lots or the probability of their sale; but that they were to ascertain the fairest selling value of the land before and after the entry by the railroad company in order to determine the actual damage done to its owner."

We think this witness was entirely incompetent to express an opinion as to the market value of the land, and the evidence he gave should not have been received.

Turning now to the other assignment. A witness called by the defendant, E. G. Carpenter, had testified that in his judgment the market value of the tract before the appropriation of a part was $3,000; that its value after the appropriation of a part was $2,500, and that plaintiffs' damages sustained were $500. On his cross-examination he testified that in estimating the value of the land after appropriation he had taken into consideration as enhancing the value of the remainder the fact of the station having been built by defendant company near the property. On motion of plaintiffs' counsel the entire testimony of this witness was stricken out, on the ground that this was not a proper element of set-off. True, the

witness did say, upon cross-examination, that the advantage to plaintiffs' property resulting from the convenient location of the station was an advantage in which all the properties in the neighborhood shared; but he did not say that they all shared in like degree. We find it impossible to read the witness's testimony without coming to the conclusion that what he meant was that while all the properties in that neighborhood were advantaged by having the station where it is, the plaintiffs' property was especially advantaged because of its greater propinquity and accessibility. He repeatedly said, distinguishing between the railroad and the station, that it was the circumstance of the location of the latter, 1,120 feet away, that he took into consideration in estimating the advantages to the property. It would seem most unlikely that he meant that a property a mile or half a mile away from the station was equally advantaged by the station with one less than four hundred yards away, yet both would share in the advantage, though evidently not in the same degree. What he meant by the language used, if there be any doubt about it, was for the jury to determine under proper instructions to disregard it except as they found that he meant that no special advantage resulted to the plaintiffs' property therefrom; that except as they did so find the testimony was competent and was proper for the jury's consideration: Gorgas v. Philadelphia, H. & P. R. R. Co., 144 Pa. 1. "True, a depot is designed for the public benefit, but non constat that the plaintiffs' lands may not be benefited thereby. The very same thing may be said of the whole road of which the depot is part, and yet it is the whole road, and not merely that part which happens to be on the private property alleged to be damaged, which gives to it that peculiar or special value which is the subject of set-off. It, however, follows that while the general advantage resulting as well to the public as to the property which is the subject of assessment, is not to be considered in estimating the benefits to that property, yet any and every-

thing committed in the general improvement which tends to increasing its value or usefulness to such property may be considered." This was said in respect to the location of a station in Pittsburgh & Lake Erie R. R. Co. v. Robinson & Rea, 95 Pa. 426. It was error to strike from the record the testimony of this witness.

The second and fourth assignments of error are sustained, and the judgment is reversed with a venire facias de novo.